# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **JULIA RICHMOND,** | ) |
| PLAINTIFF, | ) Case No: _____ |
| vs. | ) |
| | ) **JURY DEMAND** |
| **TRACTOR SUPPLY COMPANY,** | ) |
| DEFENDANTS. | ) |

# COMPLAINT

Plaintiff Julia Richmond ("Plaintiff" or "Ms. Richmond"), by and through counsel of record, files her *Complaint* against Tractor Supply Co., and alleges as follows:

## I. INTRODUCTION

1. This is a civil action to make whole the Plaintiff for denial and interference with the exercise of rights guaranteed by the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADAAA"), including the right to be reasonably accommodated without interference or retaliation, retaliation for opposition to unlawful actions, and be free from discrimination against him on account of Plaintiff's specific disabilities; said action also brings suit under the Tennessee Disability Act ("TDA"), TCA § 8-50-103 et seq., including the right to be protected from retaliation for opposition to unlawful actions, and be free from discrimination against him on account of Plaintiff's specific disabilities.

## II. PARTIES

2. Plaintiff at all times relevant to this *Complaint,* resided in Christiana, Tennessee.

1

3. Defendant Tractor Supply Company is a commercial entity incorporated in the State of Delaware, with its principal corporate office located at 5401 Virginia Way, Brentwood, Tennessee 37027-7536. At the time of the events subject of this Complaint herein, Defendant regularly did business in numerous stores across the state of Tennessee, and employed more than 50 persons check in the said area at the time of the facts that form the basis of this Complaint.

4. Valid service of process may be obtained on Defendant Tractor Supply via its registered agent in Tennessee: C T Corporation System, 300 Montvue Rd, Knoxville, TN 37919-5546.

5. Plaintiff is a qualified individual with a disability.

### III. JURISDICTION AND VENUE

6. Plaintiff brings this action under 28 U.S.C. § 1331, alleging the original jurisdiction of this Honorable Court over this private suit to enforce federal civil rights and employment law protections.

7. Venue is proper in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because the unlawful employment practices occurred within Williamson County, Tennessee, where Plaintiff formerly worked, where Plaintiff suffered the unlawful employment practices and resultant damages, and where Plaintiff would have continued to be employed by Defendant in the absence of its unlawful employment practices.

### IV. ADMINISTRATIVE REMEDIES

8. Plaintiff has met all procedural requirements for filing this Complaint, including administrative exhaustion required for jurisdiction with this Court.

9. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and did so within 300 days of the actions of which she complained. Plaintiff filed her Charges for violations of the ADAAA on May 30, 2023 (Charge No. 494-2023-02655). On

July 13, 2023, Plaintiff received her *Right to Sue Notices* from the EEOC for the aforementioned Charges and therefore concluded the process of exhaustion requirements with the EEOC. Accordingly, this lawsuit and supporting ADAAA claims are properly and timely filed within ninety (90) days of issuance by the EEOC of Plaintiff's Notices of Right to Sue Letter on Juyl 13, 2023. **(Exhibit 1, "Notice of Right to Sue").**

## V. STATEMENT OF FACTS

10. Plaintiff, Julia Richmond, was an Assistant Store Manager who was hired by Tractor Supply Co. in 2016 to work at the Company's 5111 Murfreesboro Rd., College Grove, Tennessee storefront.

11. Ms. Richmond is an Army Veteran who enlisted in 2008 and completed eight and a half years in service and was honorably discharged.

12. During Ms. Richmond's time in service, she was deployed in 2010 to Baghdad, Iraq where she had to adjust to living in constant fear, dealt with issues and illnesses at home, and had to cope with soldier suicides both on deployment and after she got home.

13. Because of Ms. Richmond's time in service, Ms. Richmond was diagnosed with post-traumatic stress disorder (PTSD), severe anxiety disorder, and depression by Doctor Beatty in Smyrna, Tennessee in approximately 2011. Dr. Beatty had been a military doctor who had experience with veterans like Ms. Richmond.

14. Since her diagnosis Ms. Richmond has regularly taken medication to treat her psychiatric diagnoses.

15. Ms. Richmond worked at Tractor Supply Co. for almost 6 years (from 2016-2021) without any complaints about her work or management style.

16. Ms. Richmond began to experience a stressful work environment after new district manager Frank Remilard began working at the store on approximately January 1, 2022.

3

17. On February 4, 2022, Ms. Richmond was called into a human resources meeting with Jeana Sheckler and Frank Remilard.

18. In the meeting, Mr. Remilard accused Ms. Richmond of bullying teammates Rachel Ladd and Jordyn Humphreys on social media platforms snapchat and tiktok.

19. Mr. Remilard spoke harshly to Ms. Richmond throughout the meeting and continued to do so despite bringing Ms. Richmond to tears early in the meeting.

20. No evidence of Ms. Richmond's alleged bullying was provided during the meeting. When Ms. Richmond asked for more evidence and context for the accusations, Mr. Remilard told her "we're only asking because we know the truth." **Exhibit 2 – Emails: March 16, 2022**.

21. Although no evidence was provided of Ms. Richmond's alleged bullying of Ms. Ladd on social media, Ms. Richmond and Ms. Ladd did have a disagreement before the February 4th meeting. However, it was fully resolved on February 3rd, 2022, and their reconciliation conversation was recorded at the College Grove store. **Exhibit 2 – Emails: March 16, 2022**.

22. Regarding Jordyn Humphreys, again no evidence of social media bullying was provided. However, Ms. Richmond supplied Tractor Supply with evidence to show that Ms. Humphrey's was targeting and harassing Ms. Richmond. **Exhibit 2 – Emails: August 12, 2022**.

23. Ms. Richmond emailed her store manager on August 12th, 2022 to describe an incident with Ms. Humphreys that took place in approximately December of 2021. Id.

### DECEMBER 2021 INCIDENT WITH JORDYN HUMPHREYS

24. Ms. Richmond told Ms. Humphreys she could not offer Ms. Humphreys more work hours at the store. **Exhibit 2 – Emails: August 12, 2022**.

25. Ms. Humphreys then asked the store manager the same question and was denied. Id.

26. Ms. Richmond then told Ms. Humphreys she did not need to try and go around Ms. Richmond to ask a higher manager the same question. Id.

27. Ms. Richmond's comment made Ms. Humphreys extremely angry. Id.

28. Ms. Humphrey's mother called Ms. Richmond and told Ms. Richmond that Ms. Humphrey's had left the house saying things like she wanted to come to the store and "fight" or "have strong words". Id.

29. Ms. Humphrey's mother tracked Ms. Humphreys on Life360 and told Ms. Richmond that Ms. Humphrey was in fact coming to the store. Id.

30. Ms. Richmond left the store to avoid having a violent confrontation on company property. Id.

31. Ms. Richmond particularly wanted to avoid any violent confrontation at the store because the media team was on site filming that day. Id.

32. After Ms. Humphreys left, Ms. Richmond returned to the store. Id.

### JUNE 30TH INCIDENT WITH JORDYN HUMPHREYS

33. In another incident, Ms. Richmond e mailed vice president of human resources Meredith Craig, and district manager Blake Walker, on June 30th, 2022, to tell them about a concerning interaction with Ms. Humphreys. **Exhibit 2 – Emails: June 30, 2022**.

34. Ms. Humphreys returned to work on June 30th, 2022 after a sabbatical for mental health. She walked in and told Ms. Richmond "Hi." Ms. Richmond responded and said "Hi Jordyn." That was the extent of their interaction. Id.

35. Fifteen minutes later Ms. Humphrey's mother called Ms. Richmond to tell her that Ms. Humphreys said she was going to call Mr. Remilard and human resources to tell them she could not put up with how Ms. Richmond was mistreating her. Id.

36. After Ms. Humphreys finished her shift, Ms. Richmond found out Ms. Humphreys had told multiple employees that Ms. Richmond was mistreating her. Ms. Richmond told her employees all she had done that day was tell Ms. Humphreys "Hi." Id.

5

_____

37. Ms. Richmond was also critiqued at the February 4th meeting for failing to clock in and clock out properly. Ms. Richmond apologized and said because of her ADHD she has a hard time remembering to clock in and out sometimes, but that she was grateful they brought it to her attention and that she would not let it happen again. **Exhibit 2 – Emails: February 4, 2022**.

38. Although Ms. Richmond had never received any disciplinary action from human resources in the roughly six years of employment prior to the meeting on February 4, 2022, she was given a final write up at the February 4th meeting. **Exhibit 2 – Emails: March 16, 2022**

39. The meeting on February 4th triggered Ms. Richmond's severe anxiety disorder, depression, and PTSD.

40. The triggering of Ms. Richmond's PTSD caused her to cut her arm to the point of needing to go to the Emergency Room for stitches. **Exhibit 3: Emergency Room Records**.

41. When Ms. Richmond began working at Tractor Supply Co., she did not bring a service dog to work with her.

42. Because the meeting with Mr. Remilard and Ms. Sheckler triggered Ms. Richmond's PTSD, severe anxiety disorder, and depression, she needed a service dog to continue to do her job effectively at Tractor Supply.

43. Ms. Richmond knew of other employees that brought service dogs to work who had never gone through the official approval process to be able to bring their dog to work. For example, Ms. Richmond knew another employee brought a service dog to work at the Thompson Station location, and was not required to go through the full approval process for her dog.

44. Ms. Richmond still made it a point to get her store manager's approval to bring her service dog, "Steve," to work officially beginning on May 2, 2022. Pictures were shared of Ms. Richmond and Steve on the store's social media page that day.

45. On June 25th, 2022, Mr. Remilard came to the store and saw Steve. Mr. Remilard asked the store manager if Steve was approved to be with her at work. The store manager and Ms. Richmond agreed that they did not believe Steve had to be approved.

46. Mr. Remilard then said Steve had to be approved through human resources before being allowed to return to the store.

47. On June 30, 2022, Ms. Richmond sent an email to the vice president of human resources and the regional vice president expressing concerns that Frank Remilard was singling her out unfairly. **Exhibit 2 – Emails: June 30, 2022**.

48. Ms. Richmond made an official Accommodation Request to Human Resources on July 1, 2022, requesting to bring a service dog to work with her to accomplish the essential functions of her Assistant Manager position.

49. On July 23, 2022, Ms. Richmond was informed her accommodations request paperwork was insufficient.

50. Accordingly, Ms. Richmond reached out to her doctor on July 29, 2022, to request help with getting Steve officially approved. **Exhibit 2 – Emails: July 29, 2022**.

51. Eventually, Human Resources approved Steve as Ms. Richmond's service dog on August 3rd, 2022.

52. Even with Steve having official approval from Human Resources, Ms. Richmond continued to be regularly harassed by co-workers and managers about Ms. Richmond having her service dog.

53. A few days after Steve's approval, an assistant store manager from another location came in and said "your dog made a mess all over the floor." There were maybe 10 pieces of dog kibble between the dog's bowl and the wall.

54. A team lead named Tracy would regularly step over the baby gate that kept Steve enclosed instead of opening it. One day he tripped while stepping over it, got angry and threw the baby gate as hard as he could, missing Ms. Richmond and her service dog by only approximately 3 feet.

55. Tracy also regularly hid dishes, cups, and one time Steve's bowl whenever he decided those things had been sitting in the sink for too long. Ms. Richmond would then find Steve's items hidden in a locker or corner of a back room. One time Tracy threw away two of Ms. Richmond's mugs.

56. Tracy also regularly hid Steve's dog bed. Ms. Richmond would regularly have to search the store to find the bed and place it back where Steve could use it.

57. Shannon, another team lead, took pictures of a number of Steve's items and sent the pictures to human resources falsely claiming that Ms. Richmond stole all of the items.

58. Ms. Richmond reported the harassment from Tracy and Shannon to her store manager, and no disciplinary action was taken.

59. On February 14, 2023, the Loss Prevention Manager, Justin Lakins, came to the College Grove store where Ms. Richmond worked. He had a meeting with Ms. Richmond in which he asked her if she had stolen merchandise from the store. Ms. Richmond vehemently denied any theft.

60. Justin Lakins told Ms. Richmond he had received a complaint from Shannon, a team lead, that said she had seen Ms. Richmond take merchandise without paying. Mr. Lakins then claimed Ms. Richmond's customer account had no purchases since November 2022.

61. Mr. Lakins' claims about Ms. Richmond's customer account are false, as proven by Ms. Richmond's account ledger. **Exhibit 4 – Account Ledger**. The account ledger reflects purchases made between November 2022 and February 2023.

62. Ms. Richmond insisted in her meeting with Mr. Lakins that all the items for her service dog could be legally accounted for.

63. Despite Ms. Richmond's protests, Mr. Lakins gave Ms. Richmond a piece of paper indicating she was terminated effective immediately.

64. Ms. Richmond told her district store manager about her traumatic meeting with Frank Remilard on February 4th, and her self-inflicted injuries that put her in the hospital that evening.

65. In response, the district store manager indicated that Ms. Richmond's self-harm or suicidal ideation provided a permanent solution to Ms. Richmond's mental health struggles and struggles with the company. Specifically, the district store manager said "well, that (Ms. Richmond's self-harm) sounds like a permanent solution to a temporary problem."

66. After her termination, multiple employees, including but not limited to, Angie Hunter, Don Kazda, Chris Taylor, and Jeremy Simmons, told Ms. Richmond that she would still be employed with Tractor Supply were it not for her service dog.

67. The real reason Tractor Supply Co. fired Ms. Richmond was because it wanted to prevent and interfere with the exercise of her rights under the ADAAA, as a means of needless and unlawful harassment to single-out Ms. Richmond. Further, it wished to retaliate against her for exercising her rights under the ADAAA.

68. Tractor Supply Co.'s treatment of Ms. Richmond were knowing and intentional, willful, malicious, and/or reckless and were carried out with complete disregard for the consequences of such actions and Ms. Richmond's rights under federal law.

69. Tractor Supply Co. fired Ms. Richmond as an intentional act of retaliation for requesting and bringing a service dog to work for purposes of treatment of her disabilities and serious health condition from her military service.

## VI. CAUSES OF ACTION

### Count 1

### Violation of ADA/ADAAA – Disability Discrimination

70. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

71. Pursuant to the ADAAA, an individual is considered to have a disability if she has a physical impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such impairment.

72. Plaintiff has disabilities that affect her cognitive functioning and autonomic nervous system, disabilities that substantially limited her in one or more major life activities, including working and caring for herself.

73. Plaintiff was a qualified individual with a disability because she could perform the functions of her job with accommodation or without accommodation.

74. Plaintiff could perform the essential functions of her job. Plaintiff made a request for reasonable accommodation, including, but not limited to, bringing her service dog to work.

75. Plaintiff was discriminated against and eventually fired because of her disability and/or being regarded as disabled and/or request for a reasonable accommodation.

76. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

77. As a result, Plaintiff is entitled to recover her damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which he may be entitled.

## Count II

### Violation of ADAAA- Retaliation

78. Plaintiff restates and incorporates herein the foregoing paragraphs.

79. It is federal public policy and law under the Americans with Disabilities Act that employees must be able to exercise their rights without fear of reprisal or penalty from an employer.

80. Plaintiff engaged in protected activity under the ADA when she requested an accommodation of bringing her service dog to work for her disabling condition. Such actions by the Plaintiff are statutorily protected activities under ADAAA.

81. Defendant retaliated against Plaintiff for exercising her rights under the ADAAA, i.e., requesting an accommodation of bringing her service dog to work, by firing her.

82. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

## Count III

### Violation of TDA- Disability Discrimination

83. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

84. Plaintiff was disabled as defined by the TDA.

85. Plaintiff was a qualified individual with a disability and/or regarded as disabled.

86. Defendant discriminated against Plaintiff on the basis of her disability in violation of the TDA that culminated in her being fired.

87. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

88. As a result, Plaintiff is entitled to recover her damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which he may be entitled.

## RELIEF REQUESTED

Plaintiff respectfully requests:

1. A jury trial;

2. Back pay and damages for lost benefits, insurance and actual damages;

3. Reinstatement and/or front pay;

4. Compensatory damages for embarrassment, humiliation, stress, anxiety, inconvenience, and loss of enjoyment of life;

5. Liquidated damages;

6. Punitive damages;

7. Attorneys' fees and expenses;

8. Prejudgment interest and, if applicable, post-judgment interest; and

9. Such other and further legal or equitable relief to which he may be entitled under the ADAAA, the TDA, and any other statutory or common law.

## VIII. TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues.

**Respectfully submitted,**

s/ Adam Rodrigues
Adam Rodrigues, BPR#040141

Adam Rodrigues Law PLLC
4183 Franklin Rd. Ste B1 Box 209
Murfreesboro, TN 37128
Tel: 615-270-2074
Fax: 615-709-5770
adam@adamrodrigueslaw.com

*Attorney for Plaintiff*